# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF KANSAS

E. JEANNE DRAKE,                    )
                                    )
                Plaintiff,          )    **CIVIL ACTION**
                                    )
v.                                  )    No.  08-1362-MLB-KMH
                                    )
ARLIS JON "A.J." WUTHNOW,           )
individually and as Sheriff of      )
Harvey County, KS and the BOARD OF  )
COUNTY COMMISSIONERS OF HARVEY      )
COUNTY, KS,                         )
                                    )
                Defendants.         )
_____ )

## MEMORANDUM AND ORDER

This case comes before the court on defendants' motion for summary judgment. (Doc. 32).  The motion has been fully briefed and is ripe for decision.  (Docs. 33, 36, 40).  Defendants' motion is denied for the reasons herein.

Pursuant to 42 U.S.C. § 1983, plaintiff alleges that defendants: 1) violated plaintiff's First Amendment right to association and free speech and 2) retaliated against her for filing the present lawsuit. Plaintiff also claims deprivation of procedural due process under the Fourteenth Amendment.

## I.    FACTS

A large portion of the parties' statements of fact are controverted.  All facts set forth are either uncontroverted, or, if controverted, taken in the light most favorable, along with all favorable inferences, to plaintiff.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d at 670 (10th Cir. 1998).  The court will address the parties' material controverted facts in the analyses below.

In January 1994, Drake was hired by the Harvey County Seriff's Office. On March 23, 2007, defendant Arlis Jon (A.J.) Wuthnow was appointed sheriff for Harvey County to fill Sheriff Bryon Motter's unexpired term after Sheriff Motter retired. Drake was employed as an administrative aide for Sheriff Motter and continued in this position after Wuthnow's appointment. Wuthnow adopted Sheriff Motter's policies and procedures and wanted his employees to continue working in the same manner in which they had under Sheriff Motter.

Drake was responsible for making deposits, entering arrest warrant data into the national and Kansas databases, and filing warrants in the Harvey County jail. Drake's personnel file contained no negative information. On January 11, 2008, Drake received an evaluation, signed by Wuthnow, that described her as a "'cornerstone' of the Harvey County Sheriff's Office" and further stated:

> Were it not for her "behind the scenes" work, much of the day to day activity in the office would cease to occur. Jeanne is actually performing the work of 2 people and doing it with efficiency.

(Doc. 36 at 2).

A couple of weeks later, Wuthnow brought in his nominating petition for the 2008 primary and placed it on Drake's desk. Wuthnow stated, "[Y]ou can be the first one to sign my petition." Drake explained, "A.J., I can't sign that, I have to work for whoever gets sheriff." (Doc. 33 at 2). While Wuthnow did not say anything, Drake believed that Wuthnow was upset based upon how he removed the petition from Drake's desk.

Later that day, Drake walked into Wuthnow's office. Wuthnow asked, "[a]re you sure you don't want to be the first one to sign [the

petition]?" (Doc. 33 at 3). Again, Drake declined and walked out of his office. Drake told Undersheriff Tyner that she felt badly about not signing Wuthnow's petition, but she needed to remain neutral in order to protect her job.

In June 2008, Wuthnow asked Drake if her sister was mad at him because Drake's sister had placed a sign supporting the opposing candidate in her yard. At first, Drake thought Wuthnow was joking, but later believed he was actually upset based upon his facial expressions. Drake told Wuthnow that her sister would put one of his signs in her yard, but Wuthnow declined.

Approximately one month later, another woman accused Drake of calling her a "fucking bitch" and reported it to Undersheriff Tyner. Undersheriff Tyner investigated the complaint. Drake denied making the statement. Undersheriff Tyner's report was given to Wuthnow. Drake received no warning or reprimand regarding this alleged statement.

On August 5, 2008, Wuthnow lost in the primary election. Drake voted for the opposing candidate. At no time during the campaign did Drake express any political beliefs or candidate preference to Wuthnow. Drake did not campaign for either candidate because she did not want to lose her job should Wuthnow lose the election.

A couple of days later, Drake asked Wuthnow why Undersheriff Tyner changed the lock on his door.

> Wuthnow responded: "Because I can, and that's none of your business." Wuthnow said Tyner was tired of having things in his office disturbed by others and they did not know all who might have keys to the office. Plaintiff, who had a key, said, "Oh, I see, ok." As she turned to leave, Wuthnow heard plaintiff say, "That's stupid."

(Doc. 33 at 4). Drake denies that she said "[t]hat's stupid."

Later that day, Drake was preparing to leave for vacation from August 8 through August 18. Wuthnow told Drake "to have a safe trip, be careful and asked if there was anything he could do to make it easier for her when she returned." Drake asked Wuthnow to "keep her desk cleaned off and to take care of the mail." (Doc. 33 at 5). Wuthnow said that he would.

While Drake was on vacation, Wuthnow was in her office and found a note in Drake's personal filing cabinet. Drake suspected that someone was going through her personal belongings. Drake wrote a note saying "NOTHING IN HERE is ANYBODY'S Business Don't Make me get a lock for it." (Doc. 33 at 5).

Wuthnow began to question Drake's job performance and started investigating her work. Wuthnow opened Drake's desk and found several checks that had not been deposited. Defendants contend that one of Drake's job assignments was to make weekly deposits. Defendants assert that one check in the amount of $77,821.60 came in prior to Drake's vacation. Drake controverts defendant's statements of fact and states that she did not make deposits every week and further that some of the checks arrived while Drake was on vacation.

Wuthnow also discovered that arrest warrants were not timely entered into the Kansas Hot Files system. Drake states that several employees were responsible for entering in arrest warrants and further that the staff was behind on entering the warrants.

> The Sheriff and Undersheriff knew they were behind on warrants and Jeanne begged for help to get them caught up. Before Jeanne left on vacation, Wuthnow told her to finish up the "hot file" warrants when she got back.

(Doc. 36 at 6-7).

Additionally, Wuthnow began to think that Drake was interfering with his authority after two deputies told Wuthnow that Drake had made negative comments about him and others in the department. However, Drake denies making negative comments.[1]

While Drake was on vacation, Wuthnow called Undersheriff Tyner into his office and told Undersheriff Tyner that he was going to fire Drake. Undersheriff Tyner did not object.

On August 18, Drake returned to work after her vacation. Wuthnow terminated her and stated that "he was terminating her because she was running her mouth at the jail and because she had never liked him." "Wuthnow [also] told a supporter on his campaign committee ... that he decided to terminate Jeanne because she was 'padding her timecards.'" (Doc. 36 at 7). Drake did not receive any notice or warning prior to her termination.

Drake immediately filed a Harvey County grievance, which stated:

> "Fired on the spot By Sheriff no verbal or written warnings. Was told I ran my mouth at jail and haven't liked the Sheriff since he took office. I have worked for the Sheriff for the past 15 months and made sure the office was functioning."

(Doc. 33 at 6).

On August 26, Wuthnow denied Drake's grievance citing K.S.A. 19-805 and <u>Board of County Com'rs of County of Lincoln v. Nielander</u>, 275

---

[1] Drake denies making a negative comment to Officer Gonzales because she knew that Wuthnow and Officer Gonzales were friends. Drake also responds that "the out-of-court statement allegedly made by Huntley are hearsay and not admissible for purposes of summary judgment." (Doc. 36 at 7).

Kan. 257, 62 P.3d 247 (2003).[2]  Wuthnow did not seek approval from defendant Board of County Commissioners of Harvey County, Kansas ("the Board") prior to his denial based upon <u>Nielander</u>.  Additionally, Wuthnow did not hold a hearing because he believed that Drake received a hearing when she was terminated.

The Board also reviewed Drake's grievance and likewise decided not to hold a hearing based upon K.S.A. 19-805 and <u>Nielander</u>.  The Board further concluded that it was without authority to overrule Wuthnow's decision to terminate Drake based upon the holding in <u>Nielander</u>.

In September 2008, T. Walton, the Democratic Party nominee for Sheriff, told Drake that he was sorry that she had been fired.  Drake asked Walton if she could have her job back in the event that he was elected.  Walton was unaware of the Wuthnow's reasons for terminating Drake and agreed to hire her.

On November 4, Walton was elected Harvey County Sheriff.  Later that month, Drake contacted Walton at his home and asked about his plan to hire her.  Prior to Drake's visit, Walton had learned about Drake's lawsuit from either the media or Drake herself.  Walton indicated that he "was not concerned about the lawsuit because it did not involve his administration[ ]" and that he still planned to hire Drake.  (Doc. 33 at 7).

During the transition period between administrations, Wuthnow explained to Walton the reasons he had fired Drake and the problems

---

[2]The Kansas Supreme Court held that "K.S.A. 19-805(d) does not give county commissioners the ability to supersede a sheriff's power to appoint, promote, demote, or dismiss his or her personnel." <u>Nielander</u>, 62 P.3d at 254.

with her job performance. "Walton [also] visited the Sheriff's office a number of times and confirmed for himself that plaintiff had not properly processed a number of warrants." (Doc. 33 at 8). This concerned Walton because he believed that the warrants needed to be properly entered into the databases.

Prior to taking office in January 2009, Walton met with Harvey County auditors after the Sheriff's department operations were audited. The auditors told Walton that:

> some of the office operations for which [Drake] had been responsible were in bad shape. There had not been appropriate checks and balances to assure the proper performance of these operations, including the handling of financial matters, since Motter's administration. Walton was committed to having good fiscal responsibility and did not want financial problems or issues during his administration.

> *       *       *

> [Drake] had apparently been allowed to run the Sheriff's office operations pretty much as she saw fit without oversight, starting when Motter was Sheriff.

(Doc. 33 at 8).[3]

Some time after Walton met with the auditors, Drake called Walton to discuss her employment. Walton decided not to hire Drake and told her that he could not hire her because of the lawsuit.

## II.  SUMMARY JUDGMENT STANDARDS

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of

---

[3]Drake objects as to hearsay on the auditors' statements. The court finds that defendants are not using the auditors' statements for the truth of the matter asserted, but to show Walton's belief and reasons for why he did not want to hire Drake after talking with Wuthnow and the auditors.

summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim. Adamson v. Multi Community Diversified Svcs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008). When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). If so, the court cannot grant summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## III.  ANALYSIS

When government officers abuse their power, suits against them allow those wronged an effective method of redress. See Anderson v. Creighton, 483 U.S. 635, 638 (1987) (citing Harlowe v. Fitzgerald, 457 U.S. 800, 814 (1982)). Pursuant to 42 U.S.C. section 1983, any person who "under color of . . . [law] . . . subjects, or causes to be subjected, . . . any [person] . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 was enacted to provide protections to those persons wronged by the misuse of power. While the statute itself creates no substantive civil rights, it does provide an avenue through which civil rights can be redeemed. See

<u>Wilson v. Meeks</u>, 52 F.3d 1547, 1552 (10th Cir. 1995). To state a claim for relief in a section 1983 action, plaintiff must establish that she was (1) deprived of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed under color of state law. <u>See</u> <u>Am. Mfr's. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50 (1999). There is no dispute that defendants were acting under color of state law.

### A. Eleventh Amendment Immunity

Drake brings claims against Wuthnow in both his official and individual capacities. Wuthnow responds that he is immune under the Eleventh Amendment from liability for damages in an action brought against him in his official capacity.

"The Eleventh Amendment provides: 'The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.'" U.S. Const. Amend. 11; <u>Meade v. Grubbs</u>, 841 F.2d 1512, 1524 -25 (10th Cir. 1988). The Eleventh Amendment also bars suits against the state, its agencies, and officers acting in their official capacities from the state's own citizens. <u>Meade</u>, 841 F.2d at 1525.

Wuthnow is either a Kansas officer, and immune from suit under the Eleventh Amendment, or a Harvey County officer. Drake has also sued the Board. Even if Wuthnow could be sued in his official capacity, Drake's claims against Wuthnow are redundant to her claims against the Board. <u>See</u> <u>Moore v. Board of County Com'rs of County of Leavenworth</u>, 470 F. Supp. 2d 1237, 1256 (D. Kan. 2007) (stating that the official capacity claims against the sheriff were actually claims

against the County itself). Therefore, the court need not decide the issue regarding Eleventh Amendment immunity and Wuthnow is entitled to summary judgment on Drake's claims against him in his official capacity.

### B. Qualified Immunity

While § 1983 permits the possible vindication of a plaintiff's rights, non-meritorious suits exact a high cost upon society and law enforcement personnel. See Anderson, 483 U.S. at 638. Indeed, the Supreme Court and the Tenth Circuit have recognized these suits may unduly interfere with the discharge of discretionary duties due to the constant fear civil litigation and potential monetary damages. See Harlowe v. Fitzgerald, 457 U.S. 800, 814 (1982); Wilson v. Stock, 52 F.3d 1547, 1552 (10th Cir. 1995). "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." Horstkoetter v. Department of Public Safety, 159 F.3d 1265, 1277 (10th Cir. 1998) (internal quotations omitted) (citing Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)).

In order to balance these competing interests, government officials performing discretionary duties are afforded qualified immunity shielding them from civil damages liability. Pearson v. Callahan, 129 S. Ct. 808, 815, 172 L. Ed.2d 565 (2009). Qualified immunity protects these officials unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." Id.; Baptiste v. J.C. Penney

<u>Co., Inc.</u>, 147 F.3d 1252, 1255 (10th Cir. 1998).  The defense not only provides immunity from monetary liability, but perhaps more importantly, from suit as well.[4]  <u>See</u> <u>Horstkoetter</u>, 159 F.3d at 1277.

When a defendant claims qualified immunity, the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's actions violated a constitutional right and (2) demonstrating the right allegedly violated was "clearly established" at the time the conduct occurred.  <u>Pearson</u>, 129 S. Ct. at 815-6.  As noted in <u>Pearson</u>, courts are no longer required to follow the two-step sequence mandated by <u>Saucier v. Katz</u>, 533 U.S. 194 (2001).  <u>Id.</u> at 818.  "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  <u>Id.</u>  The court will first address the clearly established prong.

### 1.  Violation of Constitutional Right

To determine whether plaintiff has sufficiently shown the violation of a constitutional right at all, this court must determine whether plaintiff's allegations, if true, state a claim for a violation of a constitutional right.  <u>See</u> <u>Romero</u>, 45 F.3d at 1475 (relying in part upon <u>Siegert v. Gilley</u>, 500 U.S. 226, 231-32 (1991)).  Determining whether a plaintiff has stated a claim for a

---

[4]  One of the purposes of qualified immunity is to "protect public officials from the 'broad-ranging discovery' that can be peculiarly disruptive of effective government." <u>Anderson</u>, 483 U.S. at 646 n.6.

constitutional violation is purely a legal question.[5]  See id.
Despite the inevitable factual issues that become intertwined in the
characterization of a plaintiff's precise constitutional claims, this
court cannot avoid the legal issue by simply framing it as a factual
question.  See Archer v. Sanchez, 933 F.2d 1526, 1530 n.7 (10th Cir.
1991).

### a.   First Amendment

The parties' memoranda address two separate claims under the
First Amendment: 1) retaliation based on freedom of speech and 2)
retaliation based on freedom of association.

### Freedom of Speech

The general rule is that government officials cannot lawfully
limit their employees' speech on matters of public concern unless
specific circumstances are met.  See Brammer-Hoelter v. Twin Peaks
Charter Academy, 492 F.3d 1192, 1202 (10th Cir. 2007) ("[W]hen
government employees speak on matters of public concern, 'they must
face only those speech restrictions that are necessary for their
employers to operate efficiently and effectively.'").

> After the Supreme Court's recent decision in Garcetti v.
> Ceballos, 547 U.S. 410 (2006), it is apparent that the
> "Pickering" analysis of freedom of speech retaliation
> claims is a five step inquiry which we now refer to as the
> "Garcetti/Pickering" analysis.  First, the court must
> determine whether the employee speaks "pursuant to [her]
> official duties."  If the employee speaks pursuant to [her]
> official duties, then there is no constitutional protection
> because the restriction on speech "simply reflects the
> exercise of employer control over what the employer itself
> has commissioned or created."  Second, if an employee does

---

[5]  Similarly, whether the right was clearly established at the
time the incident occurred is also a legal question.  See Romero, 45
F.3d at 1475 (relying in part upon Siegert v. Gilley, 500 U.S. 226,
231-32 (1991)).

not speak pursuant to [her] official duties, but instead
speaks as a citizen, the court must determine whether the
subject of the speech is a matter of public concern.  If
the speech is not a matter of public concern, then the
speech is unprotected and the inquiry ends. Third, if the
employee speaks as a citizen on a matter of public concern,
the court must determine "whether the employee's interest
in commenting on the issue outweighs the interest of the
state as employer."  Fourth, assuming the employee's
interest outweighs that of the employer, the employee must
show that [her] speech was a "substantial factor or a
motivating factor in [a] detrimental employment decision."
Finally, if the employee establishes that [her] speech was
such a factor, "the employer may demonstrate that it would
have taken the same action against the employee even in the
absence of the protected speech."  The first three steps
are to be resolved by the district court, while the last
two are ordinarily for the trier of fact.

Id. at 1202-03 (internal citations omitted).

Defendants do not contend that Drake was speaking pursuant to any official duty.  The court will next consider whether Drake's speech was a matter of public concern.

"Matters of public concern are 'those of interest to the community, whether for social, political, or other reasons.'" Id. at 1205.  The court may consider the speaker's motive for making the speech, i.e. whether it is to alert others of a public matter or only relevant to the speaker.

Defendants contend that Drake's refusal to sign Wuthnow's petition was purely personal in nature and that Drake's motive was to protect her own employment.  Drake told Wuthnow that she would not sign his petition because she had to work for whomever was elected Sheriff.

"Courts have held that political speech regarding a public election is undoubtedly a matter of public concern." Id.  More important, courts have held that petition circulation is protected

speech. <u>Meyer v. Grant</u>, 486 U.S. 414, 422, (1988) "[T]he circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" <u>Id.</u>

The court finds that Drake's refusal to sign Wuthnow's petition did touch on matters of public concern. It is true that Drake was partly motivated in making the speech by her own personal agenda of keeping her employment. Nonetheless, Drake was also making a public statement that she would not openly support Wuthnow in the primary election. Drake knew Wuthnow would file his petition and further that her signature would be evidence of her support for Wuthnow. This public display of political support is precisely what Drake wanted to avoid. Drake's First Amendment right includes a refusal to support a candidate and her refusal of to sign Wuthnow's petition is protected speech. <u>See Aiken v. Rio Arriba Bd. of County Com'rs</u>, 134 F. Supp.2d 1216, 1225 (D. N.M. 2000) ("[R]efusal to participate in an allegedly politically-motivated campaign is an act of speech, just as much as participating in such a campaign is[.]").

The court next considers "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." <u>Brammer-Hoelter</u>, 492 F.3d at 1202-03.

Defendants have made no claim that Drake's refusal to sign Wuthnow's petition harms any interest that defendants may have. Drake's employment does not require political allegiance. The court will not speculate as to what interests, if any, might be harmed as a result of Drake's refusal.

The fourth and fifth steps under the "<u>Garcetti/Pickering</u>"

-14-

analysis are ordinarily questions of fact. Drake must present evidence that her speech was a substantial factor in Wuthnow's decision to terminate her employment. If so, than Wuthnow may demonstrate that he would have fired Drake even in the absence of the protected speech.

"What constitutes a substantial motivating factor evades precise definition." Maestas v. Segura, 416 F.3d 1182, 1188 (10th Cir. 2005). However, Drake is required to show that her refusal played a substantial part in Wuthnow's decision to terminate her employment. See Id. (stating that the speech does not have to be the sole reason or proximate cause of the adverse action).

> The Tenth Circuit has explained the evidence that is required to create a factual dispute regarding a substantial or motivating factor. "Adverse action in close proximity to protected speech may warrant an inference of retaliatory motive." Maestas, 416 F.3d at 1189 (citing Baca v. Sklar, 398 F.3d 1210, 1221 (10th Cir. 2005)). However, even temporal proximity is "insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision." Id. (citations omitted). An employer's knowledge of protected activity, "together with close temporal proximity" between the protected activity and the adverse employment action, "may be sufficiently probative of causation to withstand summary judgment." Maestas, 416 F.3d at 1189. In contrast, "evidence such as a long delay between the employee's speech and challenged conduct" or evidence of "intervening events" tend to "undermine any inference of retaliatory motive and weaken the causal link." Id.

Underwood v. Board of County Com'rs of County of Jefferson, 611 F. Supp.2d 1223, 1229-30 (W.D. Okla. 2009).

Defendants contend that Drake's refusal to sign the petition and Wuthnow's comment regarding the sign in Drake's sister's yard were too remote in time to establish any causal connection to her termination. In January 2008, Wuthnow twice asked Drake to sign his petition and

Drake refused. Drake was terminated approximately seven months later on August 18. Drake does not allege that Wuthnow made any other comments or actions regarding Drake's refusal to sign his petition during these seven months.

In June 2008, Wuthnow asked Drake if her sister was mad at him because of the sign in her yard. The sign was in Drake's sister yard. Drake's response was that her sister would also put one of his signs in her yard.

The court finds that Drake made no protected speech at this time. The sign belonged to Drake's sister's and was her political speech. Drake's response to Wuthnow's question was not a matter of public concern because Drake was simply commenting on what her sister might do. Drake took no political stance on either candidate. Nor did Drake's response constitute nonpolitical affiliation. As a result, the June 2008 incident involving Drake's sister's sign has no bearing on the court's causal connection analysis. See Brammer-Hoelter, 492 F.3d at 1202-03 ("If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends.").

The court finds that Drake's refusal to sign Wuthnow's petition, occurring seven months prior to Drake's termination, weakens the causal connection. However, the court takes note of the fact that Drake's termination occurred soon after Wuthnow lost the primary election.

Wuthnow lost on August 5. Drake worked August 6 and 7. Drake stated in her deposition that on August 6, Wuthnow walked down the hall and said "[t]his must be what everybody must have wanted." (Doc. 33-3 at 2). She left for vacation on August 8 and returned to work

on August 18 and was immediately fired upon her return. The temporal proximity between Wuthnow's defeat and Drake's termination somewhat strengthens the causal connection. A reasonable jury could infer that Wuthnow was upset about not having Drake's support, which contributed to his loss in the election. This inference, taken in consideration with Wuthnow's reasons for Drake's termination, see _infra_, and the numerous controverted facts, makes the free speech issue appropriate for a jury.

The court finds that Drake has set forth enough evidence to show that a reasonable jury could find that her speech was a substantial and motivating factor in Wuthow's decision to terminate. Therefore, the burden shifts to defendants to show that Wuthnow would have fired Drake regardless of her speech. Defendants must provide a legitimate, non-retaliatory reason for Drake's termination. Burns v. Board of Com'rs of County of Jackson, Kansas, 197 F. Supp.2d 1278, 1290 (D. Kan. 2002).

On August 18, Wuthnow told Drake that he was terminating her because she ran her mouth at the jail and did not like him from the start. Drake denied making the statements and got up and walked out of Wuthnow's office. (Doc. 40 at 3). Later, "Wuthnow told a supporter on his campaign committee ... that he decided to terminate Jeanne because she was 'padding her timecards.'" (Doc. 36 at 7). In defendants' memorandum, Wuthnow provided the following reasons for terminating Drake:

> Just before plaintiff went on vacation, plaintiff unreasonably questioned Wuthnow's decision to allow the Undersheriff to change the lock on his office door. Wuthnow heard plaintiff say that his explanation was "stupid." SOF 17.

While plaintiff was on vacation, Wuthnow found an odd sign in one of plaintiff's drawers that caused him to wonder whether plaintiff was properly discharging her duties. SOF 19.

Upon investigation, Wuthnow discovered that plaintiff had not deposited checks when her documents indicated she had done so, including a check for $77,821.60 to pay for housing federal prisoners. Wuthnow believed that plaintiff received this check before plaintiff went on vacation and that she had failed to deposit it. SOFs 20-21.

Wuthnow discovered that plaintiff had failed to enter information into the arrest warrant data bases or otherwise properly process warrants, one of plaintiff's most critical job responsibilities. SOFs 5, 22.

Other employees approached Wuthnow to report that plaintiff had been making disparaging or negative comments about him, the Undersheriff and others in the department. Wuthnow came to believe plaintiff was trying to undermine his authority. SOF 23.

Wuthnow was also aware of other comments plaintiff had made about her co-workers and the recent incident in which a citizen had accused plaintiff of calling her a "fucking bitch." SOF 12.

(Doc. 33 at 17-18).

Because defendants have provided legitimate, non-retaliatory reasons for Drake's termination, Drake must show that a reasonable jury could find that defendants' articulated reasons are pretextual. Burns, 197 F. Supp.2d at 1290 (stating that "the plaintiff can avoid summary judgment only if he is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason is pretextual[]").

Drake responds that Wuthnow's reasons are pretextual because they are inconsistent with the initial reasons Wuthnow gave Drake on August 18. "A plaintiff may show pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" Id.

Based upon the following reasons, the court finds that Drake has satisfied her burden such that a reasonable jury could find that Wuthnow's proffered reasons are pretextual for terminating Drake because of her refusal and election. First, on August 18, Wuthnow told Drake that she did not like him from the start. Yet, in his deposition, Wuthnow stated that "[Drake] was actually very encouraging and told me she thought I'd make a good sheriff." (Doc. 36-17 at 20).

On January 11, Drake received glowing remarks in her evaluation. Undersheriff Tyner wrote the evaluation and Wuthnow signed off on it. Undersheriff Tyner stated in his affidavit that "[a]t the time I did the evaluation I thought it was true and I still believe the evaluation was fair and accurate." (Doc. 36-7 at 3). Wuthnow admits that he did not read the evaluation prior to signing it, but stated in his deposition that at the time, he would have agreed with it. (Doc. 36-17 at 21-22). Wuthnow does not allege that Drake's performance decreased during the time he was sheriff, but that he discovered errors in her work after he began investigating. While Wuthnow may have in fact only realized Drake's errors while she was on vacation, and the court is not deciding one way or another, Wuthnow's investigation began within days of losing the primary election. It is reasonable to infer that had there been as many problems with Drake's job performance as detailed by Wuthnow in August

2008, there would be evidence in Drakes' personnel file.[6]  Other than the July 2008 incident where Drake called another employee a "fucking bitch," there are no negative reports for insubordination or making personal phone calls and personal visits while on the clock.  (Doc. 33-12 at 1).  It is for the jury to decide whether or not Wuthnow's investigation was in response to Drake's alleged insubordination or pretext for retaliation as Drake contends.

The parties agree that there were other checks inside Drake's desk that could have been deposited prior to Drake's vacation. However, the parties disagree as to whether Drake was supposed to make weekly deposits or use her discretion as to when a deposit should be made.  The parties also dispute as to when the United States Treasury check for $77,821.60 came in and whether Drake was available to deposit the check prior to her vacation.

Additionally, Drake contends that Wuthnow knew the "hot file" warrants were not up to date prior to Drake leaving for vacation.  In her affidavit, Drake stated Wuthnow knew she was behind on the warrants and that she begged for help to get caught up.  (Doc. 36-2 at 3).  Wuthnow told Drake that she could finish up the "hot file" warrants after she returned from vacation.  Wuthnow does not deny that this exchange occurred, but responds that some of the warrants dated back long before Drake asked for help with the "hot-file" warrants prior to her vacation.

Because the facts supporting Wuthnow's reasons are so heavily disputed, the court finds that summary judgment is not appropriate.

---

[6] Wuthnow testified at his deposition that there was nothing negative in Drake's personnel file.  (Doc. 36-17 at 20).

The parties' explanations about what Wuthnow "found" or "discovered" when Drake was on vacation go back and forth. Defendants have presented no evidence as to Wuthnow' allegation that Drake was making numerous personal phone calls and visits. A jury will need to decide which party is more credible and the weight to assign to each explanation. As such, Drake has met her burden to show Wuthnow violated her constitutional right to free speech.

Freedom of Association

The First Amendment protects employees from being discharged based on "'political beliefs, affiliation, or non-affiliation unless [her] work requires political allegiance.'" <u>Gann v. Cline</u>, 519 F.3d 1090, 1093 (10th Cir. 2008) (citations omitted).

> Political patronage need not be the sole reason for an employee's discharge, it need only constitute a substantial or motivating factor. Once a plaintiff proves political patronage was a substantial or motivating factor behind [her] dismissal, the burden of persuasion shifts to the defendant to prove, as an affirmative defense, that the discharge would have occurred regardless of any discriminatory political motivation.

<u>Id.</u> (internal citations omitted).

The parties do not dispute that Drake's action of declining to sign Wuthnow's petition is protected under the First Amendment. <u>See also</u> <u>Gann</u>, 519 F.3d at 1094 (noting that an adverse employment action includes being "fired for failing to endorse or pledge allegiance to a particular political ideology[]"). Nor do the parties dispute that Drake's employment was not subject to political allegiance. However, defendants contend that Drake's refusal to support Wuthnow in the primary election had no bearing on Wuthnow's decision to terminate Drake. Defendants further contend that Drake's termination would have

occurred regardless of Drake's refusal to support Wuthnow.

Based upon the court's findings on the issue of free speech, supra, the court finds that Drake has established sufficient evidence to show that a genuine issue of material facts exists such that a reasonable jury could conclude that Drake's non-affiliation and lack of political support for Wuthnow's campaign was a substantial or motivating factor in Wuthnow's decision to terminate Drake. Likewise, the court finds that Drake has also shown a genuine issue of material fact exists as to whether Wuthnow's reasons are pretextual. Therefore, Drake has met her burden to show that defendants violated her First Amendment right of freedom of association.

### b. Procedural Due Process

Drake claims that defendants violated her Fourteenth Amendment right to procedural due process when she was denied a hearing following her termination. The court engages in a two-step inquiry to determine whether an individual was denied procedural due process: "(1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." Riggins v. Goodman, 572 F.3d 1101, 1108 (10th Cir. 2009).

Property Interest

"A public employee facing discharge is entitled to the safeguards of procedural due process only if he can demonstrate that the termination implicates a property or liberty interest protected by the Due Process clause ..." (Citations omitted). In order for employment to be a protected property interest, the employee must have a "legitimate claim of entitlement to it." (Citations omitted). Whether there is a legitimate claim of entitlement is a question of state law.

Koopman v. Water Dist. No. 1 of Johnson County, Kan., 972 F.2d 1160,

1164 (10th Cir. 1992).

Defendants contend that Drake was an at-will employee and therefore, had no property interest in her employment. The general rule in Kansas is that an employee is an at-will employee unless otherwise specified by contract or rule. <u>Allegri v. Providence-St. Margaret Health Center</u>, 9 Kan. App. 2d 659, 663, 684 P.2d 1031, 1035 (1984) ("Kansas follows the general rule that 'in the absence of a contract, express or implied, between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party, and the employee states no cause of action for breach of contract by alleging that he has been discharged.'"). "In Kansas, whether an implied contract exists which creates a property interest in employment normally is a question of fact for the jury." <u>Koopman</u>, 972 F.2d at 1164 (citing <u>Allegri</u>, 684 P.2d at 1035; <u>Morriss v. Coleman Company</u>, 241 Kan. 501, 738 P.2d 841 (1987)).

Sheriff Motter stated in his affidavit that:

> 5. When I was sheriff, I always told the employees of the HCSO that we had to show cause for their termination. I was always under the impression that I had to show cause to terminate an employee (other than the undersheriff), and that is why the policy manual does not make the employment at will. I thought this was important not only for morale purposes, but was also told this was the law by our attorney.
> 6. I specifically provided a grievance procedure in the policy manual because I wanted employees to be able to grieve their treatment. Discipline under the policy was a progressive process. I wrote the policy manual as requiring the building of a case against an employee, documenting each step of discipline before a termination resulted.
> 7. Employees of the HCSO, other than the undersheriff, knew that they could not be terminated at will. They knew they had their job as long as they performed and I always thought this was good for morale at the Sheriff's Office. Since they had to read and agree to abide by the policy manual when they were hired, we always considered that to be part of the employment agreement.

-23-

(Doc. 36-9 at 2-3).

When Wuthnow became Sheriff, he told the employees that all of Sheriff Motter's policies remained in effect. At his deposition, Wuthnow agreed with Drake's counsel that the employees would assume that all of Sheriff Motter's policies remained in effect unless Wuthnow changed them. This was Wuthnow's intention by sending out the April 11 , 2007, memo, which was signed by Drake on April 17. (Docs. 36-17 at 19, Doc. 33-5).

Sheriff Motter's policy manual does not detail a definite term of employment. As such, "the duration of employment depends on the intention of the parties as determined by circumstances in each particular case." Allegri, 684 P.2d at 1035.

The court finds that a genuine issue of material fact exists as to whether Drake was an at-will employee or could not be terminated without just cause. Wuthnow states that he intended for the employees to be at-will employees, especially since Sheriff Motter provided him with the Nielander case. However, Wuthnow does not contend that he told the employees of his intent. Moreover, Sheriff Motter specifically told his employees that they could not be terminated without cause. Wuthnow adopted Sheriff Motter's policies when he took office and had the employees acknowledge their notice and understanding of his adoption. While employed by Sheriff Motter, Drake knew that she would keep her job as long as she maintained her work performance. Drake believed that the terms of her employment continued when Wuthnow became sheriff. Therefore, the court finds that a reasonable jury could find that Wuthnow and Drake had an implied contract that she could not be terminated without cause, which

created a property interest in her employment.

Due Process Protections

Drake contends that she was terminated without warning or notice and any pretermination hearing, or lack thereof, was inadequate. Drake further claims that Wuthnow failed to provide a post-termination hearing on Drake's termination and grievance. The parties agree that the Harvey County Sheriff's Manual "provide[s] for a pre-termination hearing and allows employees to file a grievance with the Sheriff." (Doc. 33 at 9).

Procedural Due Process serves to protect an employee, who maintains a property interest in his or her employment, from termination based upon arbitrary reasons. See West v. Grand County, 967 F.2d 362, 367 (10th Cir. 1992) ("'Without adequate due process protection, an employee ... can never discover whether the reasons offered for her discharge are true-or are false and a mere subterfuge.'"). Pretermination and post-termination hearings are used in this regard:

> The standards for a pretermination hearing are not stringent because of the expectation that a more formal post-termination hearing will remedy any resulting deficiencies. "[T]he pretermination 'hearing,' though necessary, need not be elaborate.... '[T]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.'" (Citations omitted). "[T]he pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions-essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." (Citations omitted).

Id. at 367 (citing Cleveland Board of Education v. Loudermill, 470

U.S. 532, 545-46 (1985)). A conversation or exit interview between the employee and his or her employer immediately prior to termination may be satisfy constitutional requirements when the employee has notice and the opportunity to respond. See, e.g., Powell v. Mikulecky, 891 F.2d 1454, 1459 (10th Cir. 1989) (stating that the essential requirements of due process are notice of the charges, an explanation of the evidence, and an opportunity to respond).

On the other hand, the post-termination hearing requires more formal due process protections "[b]ecause the post-termination hearing is where the definitive fact-finding occurs[.]" West, 967 F.2d at 369. Although heavily dependent on the facts of each case, courts consider whether or not the post-termination hearing provided an opportunity to the employee to confront and cross-examine her accuser in the presence of the decision maker. Id.

On August 18, Wuthnow had Drake come into his office. Wuthnow explained that he was terminating Drake because she ran her mouth at the jail and did not like him from the start. Drake denied making the statements and got up and walked out of Wuthnow's office.

The court finds that Wuthnow's meeting with Drake was adequate. Wuthnow apprised Drake of his reasons for terminating her and gave Drake an opportunity to respond. Drake chose to end the meeting by walking out of Wuthnow's office without hearing all that Wuthnow may, or may not, have said. Therefore, any fault for the brief, and possibly incomplete, pre-termination hearing is attributable to Drake as opposed to Wuthnow.

Immediately following her meeting with Wuthnow, Drake filed a Harvey County grievance. Wuthnow reviewed Drake's grievance and

denied it on August 26. Wuthnow cited K.S.A. 19-805 and <u>Nielander</u> for authority to fire employees without seeking permission from defendant the Board of County Commissioners of Harvey County, Kansas ("the Board"), and provided six reasons for Drake's dismissal. (Doc. 33-12). The Board reviewed Drake's grievance and declined to hold a hearing based on <u>Nielander</u>.

It is undisputed that Drake received no post-termination hearing following her grievance. Wuthnow denied Drake's grievance without a hearing and the Board declined to hold a hearing on Drake's grievance. While Drake received a pretermination hearing from Wuthnow, it was not before an impartial tribunal. <u>See</u> <u>Riggins v. Goodman</u>, 572 F.3d 1101, 1112 (10th Cir. 2009) ("Impartiality of the tribunal is an essential element of due process."). Therefore, the court finds that a reasonable jury could find that Drake had a property interest in her employment and further that she was denied the Due Process protections guaranteed under the Fourteenth Amendment.

## 2. Clearly Established Constitutional Right

Wuthnow claims that even if Drake establishes constitutional violations, he is entitled to qualified immunity under the clearly established prong because "[i]t could never be argued that [Drake's] entitlement to due process was clear or obvious in light of K.S.A. 19-805(a) and <u>Nielander</u>, and that denying [Drake] a grievance hearing violated that right."[7] (Doc. 33 at 26).

The Tenth Circuit requires the contours of the right at issue to be sufficiently clear that a reasonable official would have understood

_____

[7] Wuthnow limits his clearly established argument to Drake's Due Process claim.

that what he was doing violated a constitutional right that was clearly established at the time the alleged acts took place. See Cruz v. City of Laramie, 239 F.3d 1183, 1187 (10th Cir. 2001); Watson v. University of Utah Med. Ctr., 75 F.3d 569, 577 (10th Cir. 1996). This standard, however, must be used in a particularized manner[8] because "[o]n a very general level, all constitutional rights are clearly established." Horstkoetter, 159 F.3d at 1278. Were this level of particularity not required, Harlowe "would be transformed from a guarantee of immunity into a rule of pleading," that would "destroy 'the balance that [Supreme Court] cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties.'" Anderson, 483 U.S. at 639-40 (quoting Davis v. Scherer, 468 U.S. 183, 195 (1984)).

A plaintiff's burden at this stage has been described as "quite heavy," as it is insufficient to simply allege a violation of a general legal principle. See Watson, 75 F.3d at 577. In order to discharge her burden, a plaintiff must do more than simply identify in the abstract a clearly established right and allege that the defendants have violated it. See Baptiste, 147 F.3d at 1255. Rather, plaintiff must (1) articulate the constitutional right, (2) state, with specificity, the defendants' conduct that has allegedly violated this right, and (3) demonstrate a substantial correspondence between the conduct in question and prior law establishing that the

---

[8] The Tenth Circuit "has held that for a right to be 'particularized,' there must ordinarily be a Supreme Court or Tenth Circuit decision on point, or 'clearly established weight of authority' from other courts." Wilson v. Meeks, 52 F.3d 1547, 1552 (10th Cir. 1995); see also Cruz, 239 F.3d at 1187; Horstkoetter, 159 F.3d at 1278.

defendants' actions were clearly prohibited. <u>See</u> <u>id.</u>; <u>Romero</u>, 45 F.3d at 1475. Unless such a showing is made, defendants prevail. <u>See</u> <u>Romero</u>, 45 F.3d at 1475.

The court finds that the right to procedural due process protections is clearly established under Tenth Circuit law. <u>Copelin-Brown v. New Mexico State Personnel Office</u>, 399 F.3d 1248, 1255 (10th Cir. 2005) ("In general, a post-termination hearing is required."). <u>Nielander</u>, a Kansas Supreme Court case, did not alter this right. The court acknowledges that <u>Nielander's</u> interpreted K.S.A. 19-805(a) and held that a board of county commissioners may not usurp a sheriff's hiring and firing decisions regarding sheriff employees. However, <u>Nielander</u> did not alter the due process protections guaranteed to an employee under the Fourteenth Amendment. Specifically, <u>Nielander</u> did not remove Drake's right to and Wuthnow's obligation to provide an adequate post-termination hearing. <u>Nielander</u> does not remove Wuthnow's authority over his employees, but gives him complete control, within the bounds of the law, concerning his firing decisions.

Drake presents sufficient evidence that a reasonable jury could find that she had a property interest in her employment and that she received no post-termination hearing. The court finds that the law requiring a post-termination hearing is clearly established. Therefore, Wuthnow, in his individual capacity, is not entitled to qualified immunity and his motion for summary judgment on this issue is denied.

### 3. The Board

Drake brings § 1983 claims against the Board, which are

equivalent to claims against Harvey County itself. "To create liability against a local governmental body under Section 1983, [Drake] must show (1) a constitutional violation and (2) an official policy or custom which was the moving force behind the violation." Moore, 470 F. Supp. 2d at 1254. The Board cannot be liable under the theory of vicarious liability or respondeat superior. Benhardt v. Board of County Com'rs of County of Wyandotte, 9 F. Supp. 2d 1252, 1265 (D. Kan. 1998).

Drake has presented evidence as to the constitutional violation. However, the Drake has not shown that the Board acted pursuant to any official policy or custom. The Board was not involved with Drake's discharge. Nor was her discharge pursuant to any official policy or custom. While the Board declined to hold a hearing on Drake's grievance, it was not pursuant to any policy or custom. The Board based its decision on the Nielander case.

It is undisputed that the Harvey County Sheriff Office has its own policy manual, which provides for a pre-termination hearing and a grievance procedure with the Sheriff. Drake asserts that Harvey County's employment policies do not apply to her and therefore are not relevant. The Sheriff's Manual controls the hiring and firing of Sheriff employees. Therefore, the court finds that Wuthnow's failure to provide a post-termination hearing was not pursuant to the Board's policy or custom.

### Retaliation

Drake also contends that the Board through the Harvey County Counselor, Greg Nye, retaliated against her for filing the present lawsuit. Walton decided not to hire Drake and told her that he could

not hire her because of the lawsuit.

Defendants contend that Walton made this decision based upon the information he received from Wuthnow, the auditors, and his own perception concerning Drake's job performance. Drake's lawsuit did not bear on Wuthnow's decision.

Drake controverts defendants' statements that her lawsuit did not bear on Wuthnow's decision because "Walton specifically told [Drake] that he wanted to hire her but [Greg Nye, the county counselor,] would not let him do so until the lawsuit was over." (Doc. 36 at 9). While defendants deny that Nye told Walton not to rehire Drake, Walton admits that he told Drake that he could not hire her because of the lawsuit. Walton did not want to tell Drake the real reason he did not want to rehire her, i.e. he believed Drake did not adequately perform her job responsibilities while employed by Wuthnow.

Again, Drake does not point to any Harvey County policy or custom that was the driving force behind the retaliation. In the pretrial order, Drake does not allege that Wuthnow retaliated against her for filing the lawsuit, just the Board. Drake has not named Nye and/or Walton as defendants in this case and the Board cannot be vicariously liable for their actions. Therefore, the Board's motion for summary judgment on Drake's retaliation claim is granted.

## IV. CONCLUSION

For the reasons stated more fully herein, defendants' motion for summary judgment (Doc. 32) is granted as to the Board and denied as to Wuthnow in his individual capacity.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established.

A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. <u>Comeau v. Rupp</u>, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in <u>Comeau</u>. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this <u>10th</u> day of May 2010, at Wichita, Kansas.

<u>s/ Monti Belot</u>
Monti L. Belot
UNITED STATES DISTRICT JUDGE